**FILED**

JUL 16 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

(REV.5/85) Criminal Complaint

AUSA THOMAS D. SHAKESHAFT (312) 866-0667
AUSA LINDSAY C. JENKINS, (312) 353-0962

## UNITED STATES DISTRICT COURT

NORTHERN      ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER BAINES;
CHRISTINE BURGOS;
    Also known as "Christine Lugo," and "Chris"
CRAIG SMITH;
    Also known as "Stokes;" and
CHARLES PARKER
    Also known as "High School," "June" and "School"

**CRIMINAL COMPLAINT**

July 16, 08

CASE NUMBER:

# 08CR 562

## MAGISTRATE JUDGE DENLOW

**UNDER SEAL**

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief: between <u>February 2007 and March 2008</u> in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u> defendants,

    conspired with each other and with others to knowingly and intentionally distribute a controlled substance, namely, mixtures containing in excess of one kilogram of heroin, a Schedule I Narcotic Drug Controlled Substance;

in violation of Title <u>21</u> United States Code, Section <u>846</u>.

    I further state that I am a <u>Special Agent with the Drug Enforcement Administration</u> and that this complaint is based on the following facts:

    SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof: <u>X</u> Yes      _____ No

Sworn to before me and subscribed in my presence,

Eric Durante, Complainant

<u>   July 16, 2008   </u>
    Date

at   <u>Chicago, Illinois</u>
    City and State

<u>Morton Denlow, U.S. Magistrate Judge</u>
Name & Title of Judicial Officer

    Signature of Judicial Officer

| | | |
|---|---|---|
| COUNTY OF COOK | ) | **UNDER SEAL** |
| | ) SS | |
| STATE OF ILLINOIS | ) | |

## AFFIDAVIT

I, Eric Durante, being first duly sworn, state the following:

## I.    INTRODUCTION

1.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to investigate and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. As such, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510.

2.    I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been so employed by the DEA since January 2004, and I am currently assigned to the DEA High Intensity Drug Trafficking Area ("HIDTA") gang task force in Chicago, Illinois. My official DEA duties include investigating criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843 and 846. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. Some of the specialized training I have received includes, but is not limited to, classroom instruction concerning narcotics smuggling, money

laundering, and conducting conspiracy and complex investigations. I have been involved in various types of electronic surveillance (including the interception of wire communications pursuant to Title III), the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and of the laundering and concealing of proceeds from drug trafficking.

3.    Through these investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to safeguard and distribute narcotics and to collect and launder narcotics proceeds. For example, I am familiar with their use of prepaid cellular phones, normal land line phones, public phones, debit calling cards, counter-surveillance, the use of false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics in an attempt to disguise the true meaning of the conversation. I also know that consensually monitored telephone calls, as well as court authorized intercepts, often provide valuable evidence of conspiracy pertaining to narcotics trafficking activities.

A.    **Purpose of Affidavit**

4.    This Affidavit is submitted in support of a Criminal Complaint

alleging the participation of individuals in an extensive drug trafficking organization, and the issuance of arrest warrants for those defendants, as well as the issuance of search warrants for certain locations identified by law enforcement as being associated with these individuals' narcotics trafficking. These individuals, their narcotics-trafficking activities, and the locations used to traffic narcotics, are described in detail below.

### B.    The Baines DTO

5.    On the basis of the information contained in this Affidavit, and my training and experience, I allege that there is probable cause to believe that between February 2007 and March 2008, CHRISTOPHER BAINES, CHRISTINE BURGOS, a/k/a "Christine Lugo" and "Chris", CRAIG SMITH, a/k/a "Stokes", and CHARLES PARKER, a/k/a "High School," "June" and "School," listed below conspired with each other, and with others, to knowingly and intentionally distribute and possess with the intent to distribute a controlled substance, namely, mixtures containing in excess of one kilogram of heroin, a Schedule I Narcotic Drug Controlled substance, in violation of Title 21, United States Code, Section 846.

6.    This case is being investigated by agents of the DEA, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), the Chicago Police Department ("CPD") and the Cook County State's Attorney's

Office. The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by Special Agents of the DEA, FBI, IRS, officers of the CPD, investigators of the Cook County State's Attorney's Office, intelligence analysts of the DEA, and other law enforcement agents; (c) information provided by cooperating sources and cooperating defendants; (d) analysis of telephone records and pen register and trap and trace data; (e) review of consensually-recorded conversations and conversations intercepted pursuant to court authorization; (f) the training and experience of myself and other law enforcement agents, and (g) my review of laboratory analysis reports and criminal history records maintained by CPD, Illinois State Police, and the National Crime Information Center.

7.    Because this Affidavit is submitted for the limited purpose of establishing probable cause to support the Criminal Complaint; the issuance of arrest warrants against the proposed defendants; and the issuance of search warrants of certain locations identified by law enforcement as being associated with defendants' narcotics trafficking, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit.

8.    Officers, agents, and I have listened to conversations intercepted over the target phones listed below, and have attempted to transcribe them

4

accurately.  The summaries describe herein are based on draft, not final transcripts.  Based on my training, experience and the context and contents of the conversations, I have included explanations where appropriate to provide my understanding of these conversations, including my understanding of coded language and terms used by narcotics traffickers.  To the extent that intercepted and recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversations that were intercepted or recorded.  In addition, the summaries do not include references to all statements made by the speakers on the topics that are described.

## II.    BACKGROUND

9.    On the basis of the information contained in this Affidavit, my experience and training, and on the basis of other information which I have reviewed and determined to be reliable, I allege facts contained herein to show that since approximately February 2007, agents of the DEA and CPD have been investigating, among other individuals, CHRISTOPHER BAINES, and his drug-trafficking operation (the "BAINES DTO").  The BAINES DTO operates principally on the west side of Chicago, but also operates and distributes narcotics, namely heroin, and firearms in and around Berwyn, Illinois, Maywood, Illinois, Bellwood, Illinois and Chicago, Illinois.  In short, the

investigation to date has revealed that BAINES and the other defendants have conspired to sell heroin in Chicago, Illinois and elsewhere.

### A.    Intercepted Wire Communications

10.    The investigation to date has included surveillance, controlled purchases of narcotics, consensually-recorded conversations, seizures of narcotics and firearms, and court-authorized interception of wire communications for the following telephones used by CHRISTOPHER BAINES: (a) (773) 931-0491 which is hereinafter referred to as **Target Phone 1**; and (b) (773) 260-2673, which is hereinafter referred to as **Target Phone 2**.

### B.    Baines DTO

11.    Several cooperating sources ("CSs") and cooperating defendants ("CDs") have made numerous controlled purchases of heroin from members of the BAINES DTO by contacting BAINES on **Target Phones 1 and 2**. During this time, as outlined below, the CSs also made controlled purchases of heroin from PARKER and SMITH, both members of the BAINES' DTO working at BAINES' direction. BAINES controls the daily functions and operations of the BAINES DTO, which includes the distribution of narcotics.

12.    As outlined below, BAINES obtains heroin from his suppliers and provides portions of it to SMITH and PARKER. Among other responsibilities,

6

SMITH and PARKER distribute the heroin to customers on behalf of the BAINES DTO. BAINES also utilizes BURGOS as a narcotics courier.

**C.    Summary of Seizures of Narcotics, Narcotics Proceeds and Firearms.**

13.    From approximately July 2007 through January 2008, narcotics and firearms have been seized from members of the BAINES DTO. These seizures include:

> i.    July 3, 2007 controlled purchase of approximately 50.1 grams of heroin from BAINES and PARKER, in Maywood and Chicago;
>
> ii.    July 20, 2007 controlled purchase of approximately 99.9 grams of heroin from PARKER in Chicago;
>
> iii.    October 3, 2007 controlled purchase of approximately 26.4 grams of heroin from SMITH in Chicago;
>
> iv.    November 16, 2007 seizure of approximately 29.5 grams of heroin from BAINES, Individual G, and Individual H in Chicago;
>
> v.    November 17, 2007 seizure of a handgun from BAINES, SMITH, and Individual D, in Chicago, and a subsequent seizure of two revolvers from Individual D;
>
> vi.    November 30, 2007 seizure of approximately 41.3 grams of heroin from BAINES and BURGOS in Chicago; and
>
> vii.    December 19, 2007 controlled purchase of approximately 49.0 grams of heroin from BAINES and BURGOS in Berwyn, Illinois.

**D.    Summary of Locations to Be Searched and Supporting Probable Cause.**

14.    The following is list of locations used by members of the BAINES DTO where there is probable cause to believe they contain evidence of the commission of violations of Title 21, United States Code, Section 846:

      a.    **474 North Lake Shore Drive, Apartment 4104, Chicago, Illinois**, a residence for BAINES;

      b.    **901 North Lawler, Floor 2, Chicago, Illinois**, PARKER and PARKER's mother's residence; and

      c.    **1400 South 21st Avenue (and detached garage), Maywood, Illinois;** BAINES' mother and father's residence.

## II.    FACTS ESTABLISHING PROBABLE CAUSE

**A.    Confidential Source and Cooperating Defendant Information Regarding the Baines DTO.**

**1.    Confidential Source - 1**

15.    CS1 has been providing information to DEA regarding this investigation since approximately February 2007.[1]  CS1 provided information

----

[1]    In February 2007, CS1, began cooperating with DEA and has provided useful and reliable information as part of this, and other, investigations. For example, information provided by CS1 has led to the seizure of approximately 800 grams of crack cocaine and approximately 156 grams of powder cocaine. CS1 has assisted DEA and CPD in controlled purchases of heroin from BAINES, PARKER and SMITH. CS1 has been paid approximately $3,500 for his/her cooperation in this investigation since February 2007. CS1 has also worked for consideration for a defendant in a federal case in Michigan; however, CS1 is currently working for monetary reasons. CS1 has been arrested for murder/intent to kill, gambling offenses, disorderly conduct, possession of a firearm and possession of cannabis but has no convictions. CS1's basis of knowledge is based on past narcotic transactions with the said subjects. CS1 has been present

8

that BAINES supplies numerous subjects in Maywood and Chicago, Illinois, with heroin and cocaine. CS1 advised agents that in about early 2006, SMITH, who is BAINES's cousin, told CS1 that he was being supplied heroin by BAINES. CS1 has known SMITH since approximately 1991. CS1 has known SMITH to sell narcotics since that time. According to CS1, SMITH told CS1 that BAINES is his heroin supplier. In approximately 2004, CS1 was present while SMITH has been in possession of and sold heroin. CS1 told agents that previously, SMITH was getting three to four hundred grams of heroin from BAINES at a time. In December of 2006, BAINES reduced the quantity of heroin he was supplying SMITH because SMITH was in debt to BAINES. In December 2006, BAINES started to supply SMITH with only one hundred grams at a time because SMITH owed BAINES approximately $70,000. CS1 related that SMITH still owes BAINES an unknown amount of money, but BAINES continues to supply SMITH with heroin today. Agents have corroborated this information through the interception of wire communications over **Target Phones 1 and 2**.

---

while members of the BAINES DTO conducted narcotic transactions. The information provided by CS1 has been corroborated by independently obtained evidence, including telephone toll records, physical surveillance, consensually-recorded telephone calls and observed meetings with BAINES, PARKER, and SMITH.

9

16.    CS1 told agents that in about mid 2006, CS1 was introduced to BAINES by a mutual friend.  BAINES later introduced CS1 to his cousin, PARKER.  During this time, neither BAINES nor PARKER talked to CS1 about narcotics.  CS1 subsequently purchased heroin from PARKER on two different occasions in 2007, each instance being a controlled purchase monitored by DEA agents.  CS1 told agents that BAINES has no known employment that CS1 is aware of.

17.    During the course of numerous debriefings with agents, CS1 has been provided with arrest photographs, without any identifying information, and has correctly identified BAINES, PARKER and SMITH.

18.    During the course of numerous debriefings with agents, CS1 has provided telephone or direct connect numbers associated with BAINES (specifically **Target Phone 1**), PARKER and SMITH.

**2.    Confidential Source - 2**

19.    In October 2007, CS2 began cooperating with DEA and has provided useful and reliable information as part of this, and other, investigations.[2]  CS2

---

[2]     CS2's basis of knowledge includes past narcotic transactions he/she has conducted with members of the BAINES DTO.  CS2 is working for monetary reasons and has been paid approximately $1,500 for his/her cooperation in this investigation. CS2 has been arrested for mob action, retail theft, disorderly conduct, unlawful use of body armor, possession of a controlled substance with intent, armed violence, battery, criminal damage, obstruction of justice, false report of vehicle theft, aggravated felonies, driving on a suspended license, and driving under the influence of alcohol. CS2 has convictions including for possession of an altered vehicle and a conviction for

has previously provided DEA with information regarding other narcotics traffickers. For example, during a previous operation, CS2 provided information that lead to numerous arrests and the seizure of multi-kilograms of cocaine and large quantities of currency.

### 3.    Confidential Source – 3

20.    As outlined below, on October 3, 2007, CS3[3] was introduced by CS1 to SMITH. During the meeting, CS3 proceeded to purchase approximately 26.4 grams of heroin from SMITH. CS3 later related to agents that SMITH told CS3 that he was impressed by the way CS3 counted money and that CS3 should be on the "team."

### 4.    Cooperating Defendant - 1

21.    CD1 stated that he/she has been present when BAINES has talked about trafficking narcotics.[4] Since about 2006, CD1 has been present on two

---

driving under the influence of alcohol in which he was sentenced to 225 days in DOC.

[3]    In 2001, CS3 began cooperating with DEA and has provided useful and reliable information as part of other narcotics investigations. CS3 is working for monetary reasons and has been paid approximately $300 for his/her cooperation in this investigation. CS3's criminal history consists of approximately 18 arrests for, among others, murder, kidnaping, and narcotics offenses. CS3 was convicted in robbery and sentenced to 7 years in the Illinois Department of Corrections. CS3 was convicted of Conspiracy to Commit Kidnaping and sentenced to 5 years in the Illinois Department of Corrections. CS3's basis of knowledge consists of the controlled narcotic transaction in which he/she purchased narcotics from SMITH on October 3, 2007.

[4]    In early 2006, CD1 was arrested by agents of the DEA for possession of cocaine with intent to deliver. A few months later, CD1 agreed to speak with agents

11

occasions when BAINES has talked about the large sums of currency that he has made from selling narcotics. CD1 has heard BAINES brag that he has the best prices on heroin. CD1 stated that he/she has heard from other narcotics traffickers that PARKER's heroin supplier is BAINES.

22.    CD1 related he/she has been present at the nightclub "The Buzz" when BAINES was there. CD1 observed that while BAINES was at the nightclub, he is usually accompanied by five to ten people. CD1 related he/she has witnessed BAINES pay for all the people were with him while at the club. CD1 related BAINES spends $1,000 to $2,000 a night while at "The Buzz." CD1 related that he/she does not know BAINES to be employed.

23.    CD1 has been provided photographs, without any identifying information such as name or address, and has correctly identified BAINES and PARKER.

---

pursuant to the terms of a proffer letter between CD1, his/her attorney and the U.S. Attorney's Office. Although no promises have been made to CD1, CD1 hopes to obtain a sentencing benefit from the United States Attorney's Office relating to charges that have been filed against CD1 in exchange for the information he/she provided. CD1 has not been paid for his/her cooperation. CD1 has approximately 11 arrests and 3 convictions. CD1's convictions include possession of controlled substance, aggravated battery and possession of firearm. CD1's arrests were for, among others, theft, possession of a controlled substance, battery, criminal trespass to a vehicle, aggravated assault, and intent to possess cocaine with intent to deliver.

III.   **Narcotics Related Calls Intercepted Over Target Phones.**

   A.   **BAINES Talking to Narcotics Suppliers.**

24.   On or about October 18, 2007, at approximately 2:11 p.m. (call 2230), BAINES used **Target Phone 1** to place a call Individual B.[5]   During the call, Individual B asked, "When am I gonna see you?" BAINES replied "I'll bring you something today, in a little while [BAINES will bring Individual B some U.S. currency for previous narcotics that were "fronted" to BAINES]. I'm waiting on someone to call me and I'll be there to see you [BAINES was waiting on one of his narcotics customers to pay him and then he will bring it to Individual B].

25.   At approximately 2:14 p.m. (call 2231), BAINES used **Target Phone 1** to place a call to Individual B.   During the call, BAINES said, "Find out man when what's its name, when we gonna be cool again with them right ones [find out when the good quality narcotics were going to be transported]." Individual B replied, "I know, I already talked to the guy, he's not in Houston, that's why I didn't call you. He said he's supposed to arrive on Saturday. I told him I don't

---

[5]   The identity of BAINES was established by, among other things, the following: the subscriber of phone number (773)931-0491 is CHRISTOPHER BAINES; the subscriber address is 2011 Yellow Daisy Court, Naperville, Illinois, BAINES's residence; and by law enforcement agents who contacted BAINES during a traffic stop and positively identified his voice as the voice of BAINES, the principal user of **Target Phone 1.**

know if you can travel on the weekends [Individual B talked to his narcotics

source of supply and he is not in Houston, Texas yet]."

    26.    On November 26, 2007, at approximately 8:40 p.m., BAINES placed

an outgoing (call 1109) to Individual B over **Target Phone 2**. During the call,

BAINES asked Individual B, "What happened to your cousin that was supposed

to come in or your friend [what happen to the narcotics shipment]?" Individual

B replied, "I didn't hear you?" BAINES stated, "What happened to your friend

[shipment of narcotics], what we talking about?" Individual B replied, "I've been

standing by been waiting you know haven't arrived [narcotics have not arrived]."

"I talked to him [source of supply for narcotics] on Thursday and I'm still

waiting." BAINES stated, "Oh okay." Individual B replied, "And they told me

you know what they going to give me [amount of narcotics that Individual B was

going to get] but still waiting, I just don't know what happened." "I try to get a

hold of them this weekend because I had to send them some paperwork [United

States currency] and I couldn't get a hold of him [source of supply], he probably

went out of town you know Wednesday and Thursday everybody took off, you

know." BAINES stated, "Right." Individual B replied, "But you know I still

haven't been taking care of bro [paid for previous narcotics given to BAINES].

BAINES stated, "Individual DD ain't give you that [U.S. currency]?" Individual

B replied, "No." BAINES stated, "Well I'm a give you that 'em 95 [$9,500] man,

Individual DD suppose to give you that sixty-five hundred [$6,500] man, if he didn't give you that then he bogus." Individual B stated, "I only got seventeen hundred [$1,700] man." BAINES replied, "You see what kind of friend you got." Individual B stated, "Oh shit I know, I know man." BAINES replied, "Well I will call you tomorrow when I come out." Individual B stated, "Alright, call me I got other things to show..."

27.    On December 2, 2007, at approximately 4:27 p.m., BAINES using **Target Phone 2,** placed a call (call 1665) to Individual B. During this call, Individual B stated, "We need to talk bro. I need you to come out...we probably start to work pretty soon...I need you to have and I don't want nobody to know our business no more... and another thing, I run into one of my guys and told me the lease house is completely out of the question no more. I'm gonna tell you why. I think it's burned already [Individual B was about to obtain more narcotics and he wanted to start giving them to BAINES, and the lease house that Individual B used to store the narcotics was no longer safe to use because of law enforcement activity].

28.    On December 13, 2007, at approximately 2:28 p.m. (call 2630), BAINES using **Target Phone 2**, received a call from Individual B. During this call, Individual B asked BAINES "You ain't got nothing for me? No paper for me [dis BAINES have any of the money that he owes Individual B for "fronted"

15

narcotics]?" BAINES replied "Nope, never came back man [meaning he never got money back from the narcotics he gave his customers]." Individual B stated, "This asshole [Individual DD] hasn't given me. His dad is the one that gives me a couple of thousand but that's from the shit he owed me before [Individual B has not been paid yet]." BAINES stated, "[Individual DD] owes me couple of dollars again." Individual B replied, "He owe you a couple dollars again?" BAINES stated, "Ah huh." Individual B stated, "I think we have to stop fucking with him man [Individual B and BAINES should stop fronting Individual DD narcotics]." BAINES replied, "I'm done, he can't, its over, fuck him, going to keep fucking me off." Individual B said, "Yeah you right.....were, we are going to be good very soon, you know [Individual B will have more narcotics for BAINES soon]." BAINES stated, "Alright hit me up, I'll lock you in [call him when the narcotics are here]."

### B. BAINES and SMITH Ensuring the Quality of Heroin Sold to Members of the BAINES DTO.

29. On November 3, 2007, at approximately 3:01 p.m., BAINES made an outgoing call (call 2718), to SMITH on **Target Phone 1**.[6] During the call,

---

[6] The identity of SMITH was established by, among other things, the following: comparing the voice from recorded telephone calls placed to and from (773) 893-3221 to calls intercepted calls over the **Target Phones** that also were placed and received from (773) 893-3221; during one of the recorded calls, agents observed SMITH on the cell phone; after the recorded call agents observed CS1 and CS3 meet with SMITH; and CS1 identified SMITH's voice.

BAINES stated, "Cuzo, what's the dilly yo?" SMITH replied, "Yea, I had uh, I had meant to call you last night and let you know, Joe, but I said I was gonna wait to this morning' til I can get out here and get some street people to holla at me [he was going to get some heroin users to tell him what they think of the quality of the heroin mixed by BAINES]." BAINES replied, "Right." SMITH stated, "Yeah, Joe, they, they, they threw their thumbs down at me, Joe. Said it's a bad move [users did not like the quality of the narcotics]." BAINES stated, "Aight, but I'm fittin to uh. I'm a bend back on you anyway. Where you at?" SMITH replied, "On the block." BAINES stated, "I'll be over in a little bit."

30.    At approximately 4:24 p.m. on November 3, 2007, BAINES made an outgoing call (call 2722) to SMITH, over **Target Phone 1**. During the call, BAINES stated, "Hello, where you at?" SMITH replied, "I'm here. I had to run to the house and pick something up right quick." BAINES stated, "How long you going to be?" SMITH replied, "Shit, I gotta sit down. You can't come this way?" BAINES said, "Naw, I was gonna settle up and tell you to come this way, it's closer cause she in a hurry too [meaning BAINES' narcotics transporter was in a hurry and BAINES wanted SMITH to come to Berwyn to pick up narcotics]." SMITH stated, "Oh, well shit, I coming that way. What you fittin to come, on the block?" BAINES stated, "Naw, on the what's a...Harlem [7135 West Roosevelt, Berwyn, Illinois]." SMITH replied, "Shit aight." BAINES stated,

"Come on, it's important, man. For real, for real. I wouldn't even..." SMITH stated, "Aight, I fitting to turn around and come that way." BAINES stated, "Okay".

31.    At approximately 4:55 p.m. on November 3, 2007, BAINES made an outgoing call (call 2728) to SMITH, over **Target Phone 1**. During the call, BAINES asked, "Where you at?" SMITH replied "Right here, 15th and what's this, Winona, we coming up on Harlem, two blocks away from Harlem [SMITH was two blocks from the McDonald's Restaurant at 7135 West Roosevelt, Berwyn, Illinois]." BAINES replied, "Oh, McDonald's, she fittin to leave out now [meaning BAINES' narcotics transporter was going to leave from 1806 South Grove, Berwyn, Illinois with the sample of "cut" heroin to give to SMITH]." SMITH stated, "Alright."

32.    At approximately 7:05 p.m. on November 3, 2007, BAINES received an incoming call (call 2738), from SMITH over **Target Phone 1**. During the call, SMITH stated, "Yeah, he said [drug user], that's a, that's a little bit better, Joe, but it still ain't all that great. I'm fittin to go over here and hollar at a few of my people on the street and see what they got to say [SMITH stating that his narcotics customers were telling him that the heroin BAINES "cut" is a little better but not to their liking]." BAINES replied, "Call me back." SMITH stated, "Alright."

33.    At approximately 7:54 p.m. on November 3, 2007, BAINES received

an incoming call (call 2743) from SMITH, over **Target Phone 1**. During the call,

SMITH stated, "Yeah, a couple of my people goddam it, gave it an average

reading, you know what I'm saying. Couple of them gave it a six, couple of them

gave it a seven [SMITH was reporting to BAINES on the number rating of the

cut heroin]." BAINES asked, "What should I do man, that's what I was gonna

shoot out, right there what I gave you [BAINES "cut"all the heroin he had and

he was going to start transporting the "cut"heroin to members of the DTO]."

SMITH replied, "It's average Joe, you know what I'm saying. A mother fucker

ain't gonna have no problems with moving it but you know what I'm saying, I

can't see no motherfuckers starting nothing up with it [the "cut" BAINES did

was only average quality heroin, and that the heroin can be sold on the street

but customers could not start a new "line"with it]." BAINES replied, "Right."

SMITH stated, "They already going, you know what I'm saying, there wouldn't

be no problems for them they ain't gonna make no big business in it [meaning

if the members of the BAINES DTO already have customers they will have no

problem moving this "cut"heroin but ultimately the heroin is not that great of

quality]." BAINES replied, "Right, Right." SMITH stated, "Their occupation

right." BAINES replied, "Damn man. Okay, what can I do? I'll figure

something out, shit. Alright, where you at?" SMITH stated, "On the block,

hollering at my guy. Hang out with my wife for a couple of hours. Since we staying at separate spots for the time being." BAINES stated, "Alright, I'll figure something out. I'll hit you back" SMITH replied, "Alright."

34.    At approximately 8:18 p.m. on November 3, 2007, BAINES placed an outgoing call (call 2749) to SMITH over **Target Phone 1**. During the call, BAINES stated, "She fin to come back through over there [meaning BAINES' narcotics transporter was going to bring a new "cut"of heroin to SMITH at SMITH's current location]." SMITH replied, "Alright." Later in the call, BAINES stated, "I say, can you let me know right away can SMITH give him a rating right away on the quality of the new "cut"of heroin]?" SMITH stated, "Yeah." BAINES replied, "She be there like in seven or eight minutes." SMITH stated, "Alright.

35.    At approximately 8:30 p.m. on November 3, 2007, BAINES placed an outgoing call (call 2750) to SMITH utilizing **Target Phone 1**. During this call, BAINES told SMITH, "She outside [BAINES' narcotics transporter was outside with the "cut"heroin]." SMITH asked, "Down the street?" BAINES asked, "Where you at?" SMITH replied, "I see her now." BAINES stated, "Alright, call me back Cuzzo."

36.    At approximately 9:10 p.m. on November 3, 2007, BAINES received an incoming call (call 2757) on **Target Phone 1**, from SMITH. During the call,

BAINES asked SMITH, "What's the dillio?" SMITH replied, "What, one mother fucker said he ready and like and two more mother fucker's say god damn, they like it. You know what I'm saying? It could be better, but they like it. One mother fucker say he really like it [SMITH's narcotics customers liked the quality of BAINES' new "cut" heroin]." BAINES stated, "It cool now, that should be it there though [the heroin was satisfactory]." SMITH replied, "If I hear anything else, I'll holler at you and let you know."

37.    On November 4, 2007, at approximately 9:24 a.m., BAINES received an incoming call (call 2773) from SMITH, over **Target Phone 1**. During the call, SMITH stated, "Uh yea, I had to call to tell you, I had bumped into a couple of my peoples this morning Joe, they say they probably dig it. SMITH's narcotics customers like the "cut" heroin that BAINES gave him." BAINES asked, "They Do?" SMITH said, "Yea." BAINES stated, "I knew had to do it so I guess days is different now man. My rig ain't old enough for a minute. Unless the mother fucker's dollars is different, they putting the real deal out there [BAINES had to take "cut" out of the heroin and make the heroin more pure in order to bring the quality up so he can sell it on the street]." SMITH replied, "That's exactly what's going on." BAINES stated, "That's what's going on, shit, you know when that when the situation on the underwood had you all fucked up everybody went to that you know. That's what it is that's what I think it is. I think mother

21

fucker's just tires the same. I keep telling you man, we got to stay out here, fuck around, chill too long, you be like god damn." SMITH replied, "You got to play catch up." BAINES stated, "Yep. So I kind of knew what to do anyway so I just have to be the man. A minute is like two months. That's fucked up isn't it. That quick [if they stop selling heroin for a short period of time and then try to start again they fall behind and the quality of heroin on the street changes]." Smith replied, "Yeah, they tell you that how it be." BAINES stated, "Telling about quitting and coming back a year later it be all fucked up don't it." SMITH replied, "The loss of time like a mother fucker." BAINES asked SMITH, "What's you on?" SMITH stated, "Shit, on the block." BAINES replied, "I'm ready to come out now man. I feel that I figured it all out man. I was frustrated [BAINES got the "cut" heroin at the right quality now and he is now ready to start supplying his customers]."

## C.    Additional Intercepted Calls Between BAINES and BURGOS.

38.    On January 12, 2008, at approximately 9:12 p.m., BAINES made an outgoing call (call 5081) to BURGOS, over **Target Phone 2**.[7]  During the call,

---

[7]    The identity of BURGOS was established by, among other things, the following: the subscriber of phone number (312) 671-6726 is subscribed to JANET BURGOS; the subscriber address is 3741 Wisconsin Avenue, Berwyn, Illinois a known residence of BURGOS; law enforcement agents that interviewed BURGOS after the seizure of heroin identified her voice; and during the call BURGOS tells BAINES she is going to see Mello a nickname for her husband Carmelo LUGO.

BAINES asked, "What you doing?" BURGOS stated "Out." BAINES asked, "You alright?" BURGOS responded, "Yeah, I'm all right." BAINES asked, "Where your thingy at [based on this investigation this is a known coded question asked by BAINES to BURGOS to advise her in code that the narcotics customer is ready and she can make the delivery of narcotics to the customer at the pre-determined meet location]?" BURGOS stated,. "Huh?" BAINES asked, "Where your thingy at?" BURGOS stated, "I don't even know, I think I left it on top of the bed." BAINES stated, "Oh, okay, what are you doing in the morning?" BURGOS told BAINES, "Go see Mello." BAINES asked, "Oh what time you going to see him?" BURGOS said, "9:00, 9:30, I'll be out of there by 11:00." BAINES stated, "When you're done just pick me up downtown." BURGOS stated, "I'll call you." BAINES responded, "Huh?" BURGOS stated, "I'll call you." BAINES said, "Okay, I'm waiting on you, I'll be up waiting on you."

39.    On January 13, 2008, at approximately 1:39 p.m., BAINES received an incoming call (call 5110) from BURGOS on **Target Phone 2**. During the call, BURGOS stated, "Hello." BAINES replied, "What's up nappy head?" BURGOS stated, "Nothin'. Where you want me to get you at?" BAINES replied, "Shit, wait for a minute. I gotta get up with Rod, 'cause Rod the one givin' it to me, so." BURGOS stated, "Okay." BAINES replied, "And then I'll, and I'll bump into you, you know what I'm sayin'? Later on." BURGOS stated, "Huh?" BAINES stated,

"I'll bump into you later on." BURGOS stated, "Okay. You gonna' roll out?" BAINES replied, "Huh?" BURGOS stated, "You didn't roll out to (UI)?" BAINES stated, "Uh, 'bout four o'clock." BURGOS replied, "Okay." BAINES stated, "Bout four, five o'clock." BURGOS stated, "Okay." BAINES said, "Alright."

40.    At approximately 1:43 p.m. on January 13, 2008, BAINES placed an outgoing call (call 5113) to BURGOS over **Target Phone 2**. During the call, BAINES asked, "Yeah. Where you at now?" BURGOS stated, "Going home." BAINES asked, "Are you going to the house?" BURGOS stated, "Uh huh." BAINES asked, "You ain't got your thingy on you [code word for narcotics]?" BURGOS replied, "Huh?" BAINES asked, "You ain't got your thingy on you?" BURGOS stated, "Uh, I don't think so. I can check on that. I think I left it on the bed like yea... since yesterday. I'll call..." BAINES stated, "Just call me..."

41.    At approximately 6:51 p.m. on January 13, 2008, BAINES placed an outgoing call (call 5159) to Individual O while utilizing **Target Phone 2**. During the call, BAINES stated, "Hey mama." Individual O asked, "What's up baby?" BAINES asked, "Where my girl at [BURGOS]?" Individual O replied, "We are at the store getting the thing [meaning they are at the stash house picking up the narcotics]." BAINES stated, "Right, uh, huh, tell her Pete there waiting [SMITH was waiting for some narcotics]." Individual O replied, "Huh?"

BAINES stated, "My cousin, tell her he is there she know [tell BURGOS that SMITH was waiting for the narcotics at the pre-determined meet location]." Individual O stated, "Alright."

### D.    Intercepted Calls Between BAINES and PARKER

42.    On November 18, 2007, at approximately 4:56 p.m., BAINES used **Target Phone 2** (call 433) to call Individual W, on telephone number (773) 260-2673. Individual W asked where BAINES was at and BAINES told him, "At June [PARKER's] mamma house." An argument ensued and BAINES told Individual W, "We are over June [PARKER's] mamma house. I got that package for you. Now if you choose that you want it, come and get it [meaning BAINES had narcotics at 901 North Lawler and he was waiting for Individual W to come and get them]." Individual W responded, "Okay, alright. Thank you."

43.    On January 10, 2008, at approximately 1:24 p.m., BAINES placed an outgoing call (call 4836) to PARKER over **Target Phone 2** by calling (773) 808-9372.[8] During the call, PARKER asked, "Where you at?" BAINES stated,

---

[8]    Telephone number (773)808-9372 is subscribed to Charles Parker Investments at 901 North Lawler Avenue, Apartment #2, Chicago, Illinois. PARKER's voice was identified by, among other things, a positive voice identification made by CS1, and intercepted calls in which BAINES referred to PARKER as "Cous'o" and "June." Furthermore, additional calls between BAINES and PARKER were intercepted over cellular telephone number (708) 387-9401, which is subscribed to Charles Parker with a listed address of 901 North Lawler Avenue, Apartment #2, Chicago, Illinois, which is PARKER's mother's residence. Additionally, on January 2, 2008, at approximately 9:57 p.m., BAINES placed an outgoing call, (call 4208) to PARKER at (708) 387-9401, over **Target Phone 2**. At the beginning of the call,

25

"Downtown." PARKER stated, "I got to talk to you, one of my little guys he got

the little area, he got out of jail..." BAINES stated, "Right um, hum, so what else

is going on?" PARKER laughed. At approximately 4:22 p.m., BAINES placed

an outgoing call, (call 4859), to PARKER at (773) 808-9372 over **Target Phone

2**. During the call, BAINES asked, "What you on?" PARKER stated, "Shit out

here in the field baby, trying to set shit up baby." BAINES laughed and asked,

"Get it going again?" PARKER stated, "Got to baby, I got to." BAINES said, "I

hear you, there ain't nothing wrong with it. I'm here for you baby. I'll probably

be alright man, tomorrow, Saturday morning, so just tell them to be patient you

know [meaning BAINES will have more narcotics for PARKER by tomorrow or

by Saturday and to tell his narcotics customers to be patient]." PARKER stated,

"Yeah."

44.    On January 12, 2008, at approximately 1:01 p.m., BAINES received

an incoming call (call 5052) from PARKER, over **Target Phone 2**. During the

call, BAINES stated, "Me and ["Individual N"] we was talking right, he had

forgot who he first got up with a long time ago. Where was we at when

["Individual N"] first got up with us [where was the first time Individual N

starting purchasing narcotics from BAINES and PARKER]?" PARKER asked,

---

BAINES stated, "Your birthday is in two hours what you going to do?" PARKER stated,
"Shit I'm in the house watching T.V. baby." PARKER's birthday is January 3, 1968.

26

"Where was we at?" BAINES asked, "Yeah, you remember?" PARKER asked, "By my momma's house?" BAINES said, "Na [BAINES then told Individual N in the background], Don't remember neither." In the background, Individual N stated to BAINES, "I'm telling you Chris I don't remember that." BAINES then asked PARKER, "When you first got up with ["Individual N"] where was we at?" In the background, Individual N said, "Ask him [PARKER] if me and him ever did any business [ask PARKER if Individual N and PARKER ever conducted narcotics transactions]." BAINES asked, ["Did "Individual N"] ever get up with you period [meaning did Individual N ever purchase narcotics from PARKER]?" PARKER replied, "Yeah." BAINES asked, "When was that?" PARKER state, "Hold on it's been so fucking long, I think..." Individual N in the background stated, "Right when you came home or something [in 2002 when BAINES got out of prison]." BAINES stated, "No, way after that." PARKER stated, "No it was way after you came home." BAINES said, "Right about year after that, year after that [2003], cause June had just been started [PARKER just started selling narcotics in 2003]." PARKER stated, "Right, he borrowed ten dollars one time [$10,000]." BAINES asked, "See." Individual N in the background stated, "I swear I don't remember doing no bus....." PARKER stated, "Then." BAINES stated, "Yep." PARKER stated, "I gave him 25 dollars by Birdie house, I think one time." Individual N in the background, "Ah you know what I do remember."

27

BAINES stated, "My momma's house, Birdie house my momma's house." Individual N in the background stated, "I do remember." BAINES stated, "In the basement, right." PARKER stated, "In the basement, right he met me over there I gave him 25 dollars there." BAINES stated, "It was a sawbuck first and then 25 [PARKER gave Individual N $10,000 and then $25,000]." BAINES then stated to Individual N in the background, "See I started you, you owe me [meaning BAINES started Individual N in the business of selling narcotics]." BAINES then stated to PARKER, "Alright June...."

## IV.    Controlled Purchases of Heroin from the Baines DTO.

### A.    Controlled Purchase of Heroin from BAINES and PARKER over Target Phone 1.

45.    In an unrecorded conversation sometime prior to July 2, 2007, CS1 spoke to BAINES about purchasing approximately 50 grams of heroin from BAINES.  On July 2, 2007, DEA agents met with CS1 and made plans for CS1 to talk to BAINES about purchasing heroin from him.  On July 2, 2007, agents observed CS1 as CS1 dialed **Target Phone 1** and made a consensually recorded telephone call to BAINES, by calling **Target Phone 1**.  During the call, CS1 told BAINES, "I had called you because I got my telephones are coming tomorrow to me and I was just seeing" (CS1 would have the money ready tomorrow for the 50 grams of heroin).  BAINES responded, "We take care of it, don't worry about

it" (meaning he would be ready to sell the 50 grams of heroin to CS1 tomorrow). CS1 asked, "So just call you tomorrow?" BAINES replied, "Yeah."

46.     On July 3, 2007, agents observed CS1 as CS1 made a consensually recorded telephone call to BAINES by calling **Target Phone 1**. During the call, CS1 told BAINES, "I was just sitting here with him, and I told Tony you going to be here today" (BAINES would be ready to sell the heroin to CS1 today). BAINES told CS1, "Give me about ten minutes, fifteen minutes." CS1 then tried to tell BAINES where CS1 was, but BAINES could not hear him/her. A short time later, BAINES called CS1 from **Target Phone 1**. During the call, BAINES asked CS1 "Where you say you at?" CS1 responded, "Listen, I was just on the phone with Stokes (SMITH). I was telling Stokes to tell you to meet at the 'currency exchange' on 17th." BAINES asked CS1, "Where you at?" CS1 replied, "I'm fitten to leave out their house right now, come to the currency exchange right now" (meaning the currency exchange at 17th and Madison Streets in Maywood, Illinois). BAINES replied, "Alright, I'll meet you right there."

47.     Before traveling to the currency exchange, CS1 was equipped with electronic recording devices and provided $5,000 by agents. DEA agents searched CS1 and his/her vehicle for guns, drugs, and money before he/she entered into the vehicle. CS1 had no contraband on his/her person or in his/her vehicle.

48.    DEA agents then established surveillance at the currency exchange located at 1700 Madison Street, Maywood, Illinois. Other agents maintained surveillance on CS1 as CS1 drove to the currency exchange. Prior to CS1's arrival, DEA agents observed BAINES arrive at the currency exchange in a beige 2007 Chevrolet Tahoe bearing Illinois license plate 901-9050.[9] A short time thereafter, agents observed BAINES[10] park the Tahoe in the parking lot of the currency exchange and subsequently exit the vehicle.

49.    At approximately 6:59 p.m., agents observed CS1 arrive at the currency exchange and shortly thereafter, agents observed CS1 talking with BAINES. Agents then observed CS1 and BAINES walk over to BAINES's vehicle. Agents observed CS1 enter BAINES's vehicle. Agents then observed CS1 exit BAINES's vehicle and walk over to and enter CS1's vehicle. Agents then observed BAINES depart the area.

50.    At this time, CS1 was followed to 901 North Lawler, Chicago, Illinois. Agents established surveillance at 901 North Lawler, Chicago, Illinois. Agents observed CS1 arrive in front of 901 North Lawler. Agents then observed

---

[9]    Illinois license plate 901-9050 is registered to CHRISTOPHER BAINES at, 2011 Yellow Daisy Court, Naperville, Illinois.

[10]    BAINES was identified by agents conducting surveillance based on arrest photographs.

30

who CS1 identified as PARKER,[11] exit 901 North Lawler and walk to the street. Agents observed PARKER enter the front passenger side of CS1's vehicle. Shortly thereafter, agents observed PARKER exit CS1's vehicle and walk back into 901 North Lawler. Agents observed CS1 depart the area.

51.    Surveillance kept CS1 in continuous sight until they met with CS1 at another location a few minutes later. CS1 met with DEA agents and agents searched CS1's vehicle. Inside the vehicle's cup holder, agents located a clear plastic bag containing a brown powder substance. A laboratory test of the substance indicated the presence of heroin and the net weight was 50.1 grams. A search of CS1 and CS1's vehicle was conducted for guns, drugs, and money with negative results.

52.    Agents debriefed CS1 following the purchase of heroin from BAINES and PARKER. CS1 related that when he/she arrived at the currency exchange BAINES was already there. CS1 got out of his/her vehicle and proceeded to talk with BAINES. CS1 told BAINES that he/she needed fifty (50 grams of heroin). BAINES told CS1 that he needed to make a call. At this time, BAINES got on the phone and told a subject, later identified as PARKER, that he had a look out for him on 50th and Pulaski. CS1 believes BAINES was telling PARKER that

---

[11]    PARKER was identified by agents conducting surveillance based on arrest photographs.

he had someone that was going to pick up fifty grams of heroin from him. BAINES got off the phone and told him/her that CS1 had to go out west to get it. BAINES told CS1 that he "does not have stuff on him like that." BAINES told CS1 that he has seven people working for him and that he gives these people approximately five hundred grams of heroin at a time. BAINES told CS1 if he/she is "on the team" then he/she could get his own five hundred (grams of heroin). BAINES told CS1 that if he/she was "not on bullshit" he/she can get on the "team." BAINES told CS1 that CS1 was going to meet his cousin, "High School [PARKER]." BAINES told CS1 that the best he could do right now was $80 ($80 per gram) and that he wanted four bucks ($4,000) for the fifty grams. At that time BAINES placed a phone call and gave PARKER CS1's cell phone number. CS1 related that he/she thinks BAINES used the same phone on which CS1 called BAINES, **Target Phone 1,** to talk with PARKER because BAINES looked in the phone in order to give CS1's number to PARKER.

53.    According to CS1, after BAINES got off the phone, PARKER called CS1 on CS1's phone. CS1 told PARKER he/she was talking to BAINES. Phone records subsequently obtained by DEA reveal that PARKER, using telephone phone number (773)315-4452, called CS1. After receiving the call from PARKER, CS1 and BAINES walked over to BAINES's vehicle. CS1 got inside BAINES's vehicle and placed the $5,000 in pre-recorded funds in the arm rest.

54.    According to CS1, BAINES told CS1 to go to Lawler and Iowa (in Chicago) to meet PARKER. BAINES told CS1 that PARKER was his cousin. When CS1 arrived at PARKER's mother's residence at 901 North Lawler, CS1 called PARKER at (773) 315-4452 and told him that he/she was there. CS1 related that a short time later, PARKER exited his residence and proceeded to enter CS1's vehicle. Once PARKER got in the car, PARKER asked CS1 if it "was fifty." CS1 told PARKER, "Yeah." PARKER pulled the heroin out of his pocket and put it in the cup holder of CS1's car. PARKER then exited CS1's vehicle, and CS1 departed the area.

### B.    Controlled Purchase of Heroin from PARKER.

55.    In an unrecorded conversation prior to July 20, 2007, CS1 spoke to PARKER about purchasing heroin from PARKER. On July 20, 2007, CS1 met with agents and made plans to purchase 100 grams of heroin from PARKER.

56.    On July 20, 2007, agents observed CS1 as CS1 made a consensually recorded call to PARKER by calling another of PARKER's phones, (773) 655-9855.[12] During the call, CS1 asked PARKER, "Shit you got a hundred [100 grams of heroin]?" PARKER responded, "Yeah." CS1 replied, "Where do I got to come to?" PARKER said, "Same place [901 North Lawler, Chicago, Illinois]."

---

[12]    The identity of PARKER was established by, among other things, the following: CS1 identified PARKER's voice; PARKER told CS1 to come to 901 North Lawler, Chicago, Illinois a known residence of PARKER's mother, BAINES's aunt; and following the call, agents observed CS1 meet with PARKER at the listed residence.

33

57.    Before traveling to 901 North Lawler, CS1 was equipped with electronic recording devices and provided $8,000. DEA agents searched CS1 and CS1's vehicle for guns, drugs, and money before he/she entered into the vehicle. CS1 had no contraband on his/her person or in his/her vehicle.

58.    CS1 drove under constant surveillance to 901 North Lawler.  Prior to the transaction, agents established surveillance at 901 North Lawler.  During the transaction, agents observed PARKER along with three unknown individuals on the front porch of 901 North Lawler.  Agents observed CS1 park in front of 901 N. Lawler.  Agents observed CS1 exit CS1's vehicle and approach PARKER.  Agents then observed CS1 and PARKER go inside of 901 North Lawler.

59.    A short time later, agents observed CS1 and PARKER walking out of 901 North Lawler.  Agents observed CS1 get into CS1's vehicle.  Agents observed PARKER get into a Blue Dodge Magnum bearing Illinois license plate number 670 0189.  A short time later, agents observed CS1 depart PARKER's residence.  Agents then observed PARKER following CS1.  Agents observed PARKER continue to follow CS1 for a short period of time before PARKER departed the area.

60.    After PARKER stopped following CS1, CS1 drove, under surveillance, to a pre-determined meet location.  While at the meet location, CS1

relinquished custody of a clear knotted plastic bag containing a brown powder substance. A laboratory test of the substance indicated the presence of 99.9 grams of heroin. A search of CS1 and CS1's vehicle was conducted for guns, drugs, and money with negative results.

61.    Agents debriefed CS1 following the purchase of heroin and from PARKER and reviewed the recordings. CS1 related that he/she arrived at PARKER's house located 901 N. Lawler Street, Chicago, Illinois. CS1 related that when he/she arrived at PARKER's house, CS1 parked in front of the house, and saw PARKER along with three other unknown individuals on the front porch of the house. CS1 related that PARKER greeted CS1, and told CS1 to go inside the house. CS1 related that he/she followed PARKER to the living room of the second floor apartment of 901 N. Lawler Street, Chicago, Illinois. There, PARKER asked to see the money. CS1 related that he/she gave the money to PARKER. PARKER then asked CS1 how the money was stacked. CS1 told PARKER that each stack was $2,000 dollars. PARKER then looked at the money and placed it in his pocket. CS1 related that PARKER went to the rear of the apartment, came back a short time later and gave CS1 a plastic bag containing the heroin. CS1 related that PARKER then told CS1 that PARKER was going to holler at BAINES. CS1 related that PARKER told CS1 that PARKER was going to call CS1 after speaking with BAINES about this.

PARKER then asked CS1 if CS1 wanted PARKER to follow CS1 out of the neighborhood, because "vice" [law enforcement] were driving around the block. CS1 related that he/she told PARKER to follow him/her to Cicero and Augusta. CS1 related that he/she got into his/her vehicle and was followed by PARKER in a Blue Dodge Magnum. CS1 related that once he/she got to Cicero and Augusta Avenues, PARKER stopped following CS1.

## C.   Controlled Purchase of heroin from SMITH.

62.   Between October 2 and October 3, 2007, CS1 placed a series of consensually recorded telephone calls to SMITH at phone number (773) 893-3221, regarding the purchase of 25 grams of heroin by CS3 from SMITH.[13] On October 2, 2008, CS1 placed a consensually recorded call to SMITH during which call CS1 stated, "Look I'm sitting right here with my hommie, right." SMITH stated, "Yeah." CS1 stated, "He hear you so, he, I, so you won't think I'm bullshiting, because I told him you had too, you got it but we got to come around there to you, and he want to get twenty-five (25 grams of heroin) so you got to tell him all much and that shit." SMITH stated, "Alright. You talking to him on Van Buren?" CS1 stated, "Yeah he going to come around there and get it, but he

---

[13]   The identity of SMITH was established by, among other things, the following: comparing the voice from recorded telephone calls placed to and from (773) 893-3221 to calls intercepted calls over the **Target Phones** that also were placed and received from (773) 893-3221; during one of the recorded calls, agents observed SMITH on the cell phone; after the recorded call agents observed CS1 and CS3 meet with SMITH; and CS1 identified SMITH's voice.

want just know how much. He hear you talking so I got you on speaker phone, he hear you." SMITH stated, "Two [meaning $2,000]." CS1 stated, "Okay." SMITH stated, "You know I'm watching your (UI)." CS1 stated, "Alright, so uh, but he up here but he don't want to stay in a hotel tonight with it, so we, he going to come early in the morning, around the morning time, so I was just letting you know so you will be ready for him." SMITH stated, "Alright."

63.    On October 3, 2007, at approximately 12:18 p.m., agents met CS1 and CS3 at a pre-determined meeting location, where agents searched CS1 and CS3, and CS1's vehicle for contraband cash and drugs with negative results. At that time, agents gave CS3 $2,500 dollars of pre-recorded funds. CS1 and CS3 were equipped with electronic equipment in order to monitor and record the anticipated conversation between CS1, CS3 and SMITH. At approximately 12:35 p.m., CS1 placed a consenually recorded call to SMITH at (773) 893-3221. During the call, CS1 stated, "Yeah I'm about ten minutes away from you." SMITH stated, "Oh, my phone has been off that's why I haven't called you." CS1 stated, "Yeah because your phone is going to voicemail, I'm about ten minutes away from you, give me like ten minutes and I will be right over there." SMITH stated, "Alright."

64.    At approximately 1:07 p.m. on October 3, 2007, CS1 placed a telephone call to SMITH. At the same time, surveillance observed SMITH on

the cell phone while conducting surveillance.[14] During the conversation, SMITH directed CS1 and CS3 to go to the 5500 block of Gladys Street.

65.    At approximately 1:11 p.m. on October 3, 2007, surveillance was maintained on CS1 and CS3 as they parked in front of approximately 5517 W. Gladys Street.  A short time later, surveillance agents observed SMITH emerge from the gangway of 5517 W. Gladys St.  At approximately 1:15 p.m., agents observed SMITH approach CS1's vehicle on foot and engage in conversation with CS1 and CS3.  A short time later, surveillance agents observed CS1's vehicle depart the area.

66.    Agents met with CS1 and CS3 at a pre-determined meet location where agents recovered a tan powder substance wrapped in clear plastic bag from inside the cup holder from inside the vehicle. CS3 returned $600 in funds to agents that were not used during the transaction.  At this time, agents searched CS1, CS3 and the vehicle for drugs, contraband and money with negative results.  A laboratory test of the substance indicated the presence of 26.4 grams of heroin.

67.    At approximately 1:20 p.m. on October 3, 2007, agents debriefed CS1 in regard to his/her meeting with SMITH.  CS1 stated that while parked on Gladys St, he/she observed SMITH walk out of an alley and walk towards their

_____

[14]    SMITH was identified by agents conducting surveillance based on arrest photographs.

vehicle. CS1 related that SMITH walked to the passenger side of the vehicle and engaged CS3 in conversation. CS1 related that SMITH and CS3 conducted the transaction while engaged in conversation. CS1 related that CS3 gave SMITH $1,900 in pre recorded funds and SMITH gave CS3 what CS1 believed to be heroin. CS1 related SMITH was expecting $2,000 for the heroin and asked CS1 if he/she was going to give SMITH the additional $100 that SMITH wanted for the heroin. CS1 related that he/she agreed to give SMITH the $100. CS1 related that they then left the area.

68.    Agents also debriefed CS3 who related that upon arrival at the 5500 block of West Gladys, SMITH approached CS1's vehicle and started talking to him/her. CS3 related he/she told SMITH he/she only had $1900. CS3 related SMITH said okay and CS3 proceeded to count out the money. CS3 related he/she handed the money to SMITH and SMITH reached into his left jacket pocket and gave CS3 what he/she believed to be heroin. CS3 related SMITH told him/her that the way he/she counted money, he/she should be on his "team."

### D.    Controlled Purchase of Heroin from BAINES and BURGOS

69.    In an unrecorded conversation during the week of December 17, 2007, BAINES spoke to CS1. During the conversation, BAINES told CS1 that if he/she needed heroin that CS1 should come directly to him.

70.    On December 19, 2007, agents met with CS1 and made plans for CS1 to talk to BAINES about purchasing heroin from him. Agents observed CS1 make consensually recorded calls to BAINES over **Target Phone 1**.[15]

71.    BAINES subsequently directed CS1 to the area of Harlem Avenue and 22 Street, North Riverside, Illinois for the transaction. CS1 told BAINES he had to go get money for the purchase, and BAINES responded "that's cool." BAINES asked CS1 if CS1 was going to "get the bread now," and then instructed CS1 on exactly where to meet BAINES once CS1 arrived in North Riverside. BAINES asked, "You said 50, right [meaning 50 grams]?" BAINES stated, "Grab the bread and I'll come to you." At the end of the conversation, BAINES stated, "She ready now."

72.    Before traveling to North Riverside, Illinois, CS1 was equipped with electronic recording devices and provided $4,000 in pre-recorded funds. DEA agents searched CS1 and his/her vehicle for guns, drugs, and money before he/she entered into the vehicle. CS1 had no contraband on his/her person or in his/her vehicle.

---

[15]    The identity of BAINES was established by, among other things, the following: the subscriber of phone number (773)931-0491 is BAINES; the subscriber address is 2011 Yellow Daisy Court, Naperville, Illinois, BAINES residence; and by law enforcement agents who contacted BAINES on a traffic stop and positively identified his voice as the voice of the principal user of **Target Phone 1** and the voice heard in the calls on 12-19-07.

73.    DEA agents then established surveillance in the area of 2358 North Harlem Avenue, North Riverside, Illinois.  CS1 proceeded to drive to the area under surveillance.

74.    At approximately 9:00 p.m., BAINES advised CS1 in a recorded call to meet a female, later identified as BURGOS,[16] at a store near CS1's location.

75.    At approximately 9:05 p.m., agents observed CS1 near the store. A short time thereafter, agents observed BURGOS approach CS1.  Surveillance then observed BURGOS and CS1 enter CS1's vehicle.  A short time thereafter, agents observed BURGOS exit CS1's vehicle and enter the passenger side of a red Chevrolet Monte Carlo bearing Illinois license plate X14-4288.  Agents observed the Monte Carlo exit the parking lot.

76.    Surveillance kept CS1 in continuous sight until they met with CS1 at another location a few minutes later.  CS1 met with agents and proceeded to give agents a clear plastic bag containing a brown powdery substance.  A laboratory test of the substance indicated the presence of approximately 49 grams of heroin.  CS1 and CS1's vehicle were searched for money, drugs and contraband with negative results.

---

[16]    CS1 was later shown a photograph of BURGOS and identified BURGOS as the subject that approached him/her and subsequently sold CS1 the heroin.  The identity of BURGOS is also based on, among other things, the November 30, 2007 arrest of BURGOS described below.

41

77.    Agents debriefed CS1 following the purchase of heroin from BAINES and BURGOS. CS1 related that when BURGOS approached him/her, BURGOS told CS1 that she was "Chris's girl." CS1 related they proceeded to walk to and enter CS1's vehicle. CS1 related when they got into CS1's vehicle, BURGOS handed him/her the heroin. CS1 gave BURGOS the $4,000 in pre-recorded funds. CS1 related BURGOS asked CS1 how much it was supposed to be. CS1 related he/she told BURGOS $4,000. BURGOS then exited CS1's vehicle.

## IV.    Narcotics, Narcotics Proceeds, and Firearm Seizures from the Baines DTO.

### A.    Seizure from BAINES, Individual G, and Individual H.

78.    On November 16, 2007, at approximately 1:59 p.m., BAINES made an outgoing call, (call 3624), to Individual G, over **Target Phone 1**. During the call, BAINES stated, "I think I found that right one [right quality of narcotics] for us man." Individual G replied, "Okay." Individual G then stated he was moving. BAINES replied, "I want to bump into in a little bit, probably about four." Individual G responded, "That's cool, that will give me enough time, about four, five o'clock." BAINES stated, "Okay cool."

79.    At approximately 4:15 p.m., BAINES received an incoming call 3631 from Individual G over **Target Phone 1**. During the call, BAINES asked Individual G what he was doing. Individual G stated, "Man, I'm still moving." BAINES replied, "You still tied up?" Individual G responded, "Yeah, my little

42

hommie [Individual H] out there though." BAINES asked Individual G, "Where he at?" Individual G replied, "On Lake and Ashland." BAINES responded, "Tell him to swing by [Individual DD]'s residence at 5421 West Congress Parkway, Chicago, Illinois. Individual G stated, "By [Individual DD]'s?" BAINES replied, "Yeah Individual DD." Individual G responded, "All right, okay."

80.     At approximately 4:16 p.m., BAINES placed an outgoing call 3633, to Individual G over **Target Phone 1.** During the call, BAINES stated, "Oh shit you way out there." "You're going to be longer then that then." "I'll tell um shorty [Individual H] what to tell you then [I'll give Individual H your narcotics for you to get]. Individual G replied, "All right, Okay."

81.     At approximately 4:25 p.m., agents established surveillance in the area of 5421 West Congress Parkway, Chicago, Illinois. Shortly thereafter, agents observed BAINES sitting inside his 2007 Chevy Tahoe, bearing Illinois license plate 901-9050.

82.     At approximately 4:33 p.m., agents observed a blue Mazda Minivan, bearing Illinois license plate 968-0826, pull up to and park directly behind BAINES's Tahoe. Shortly thereafter, agents observed Individual H exit the minivan and approach BAINES's Tahoe. Agents then observed Individual H enter the passenger side of BAINES's Tahoe.

83.     At approximately 4:38 p.m., agents observed Individual H exit the Tahoe and return to the minivan.  A short time thereafter, agents observed the minivan depart the area westbound on Congress Parkway.

84.     Agents maintained constant surveillance on the minivan as it departed the area.  At approximately Walton and Central Avenue, CPD officers conducted a traffic stop on the minivan for a traffic violation.  During the stop, the CPD contacted the sole occupant of the vehicle, Individual H.  At this time, Individual H failed to produce a driver's license.  Individual H was handcuffed and searched for driving without a license.  During the search, CPD officers located a clear plastic bag containing a light tan in color, powder substance inside Individual H's left front pocket.  A laboratory test of the substance indicated the presence of 29.5 grams of heroin.

## B.     Firearm Seizures from BAINES, SMITH, and Individual D.

85.     On November 17, 2007, at approximately 11:10 p.m., BAINES placed an outgoing call 3681, to CRAIG SMITH over **Target Phone 1**.[17]  During the call, BAINES asked SMITH, "You remember what I got from you about two weeks ago, the big things [firearms], I got from you."  SMITH replied, "Yeah."  BAINES stated, "You got a smaller one [firearm]."  SMITH replied, "Emmanuel  got the

---

[17]     The identity of SMITH was based on, among other things, the following: agents identified SMITH's voice as the same voice identified by CS1 during the controlled purchase of heroin from him; and after numerous intercepted wire communications agents observed SMITH meet with Individual D.

motherfucker and it's over his hommie's house." BAINES later stated, "You know my buddy, not Spanky, but one of my people like Spanky [Individual D] he just call me and then I ain't got no car, shit, I'm downtown, I know you can bump into him for me [transport the firearm for BAINES]. SMITH later stated, "I'll try to get one [firearm] from Ray." BAINES replied, "Try to get one for Ray, bump into him for me it's important, man." SMITH stated, "All right."

86.    At approximately 11:47 p.m., BAINES received an incoming call 3697 from SMITH over **Target Phone 1.** During the call, BAINES stated, "Did you make it over there yet?" SMITH replied, "Yeah, yeah, I'm waiting on Blade to call me back he went to get it from Ace." BAINES responded, "All right cool." "I'm going to have dude [Individual D] come over on the block, by Individual DD's crib, you know he know where Individual DD stay at, so call me soon as you get it." SMITH replied, "Yeah I was just going to say that, don't have him come' til I get it in my possession." BAINES stated, "All right, cool." SMITH replied, "I don't want him to come for nothing." BAINES responded, "Yeah make sure, man, told him I would take care of him, it's important, if it wasn't important I would not be calling. SMITH responded, "All right."

87.    At approximately 12:01 p.m., BAINES received an incoming call 3698 from SMITH over **Target Phone 1.** During the call, SMITH stated, "Yeah

you can go on and send him [tell Individual D to come to Individual DD's house] cuzo, I got that [firearm] for him." BAINES replied, "All right."

88.   At approximately 12:30 p.m., agents established surveillance in the area of 5421 West Congress Parkway, Chicago, Illinois.

89.   At approximately 12:45 p.m., agents observed a grey X5 BMW SUV bearing Illinois license plate X54-5253, pull up in front of 5421 West Congress Parkway, Chicago, Illinois. A short time thereafter, agents observed Individual D exit the SUV and walk up to the front gate of the residence. Agents then observed Individual D get on his cell phone as he walked back to his SUV.

90.   At approximately 12:47 p.m., BAINES placed an outgoing call (call 3718) to SMITH over **Target Phone 1**. During the call, BAINES stated, "You see him yet?" SMITH replied, "I'm coming out of the alley right now." SMITH then asked BAINES, "What color is it?" BAINES replied, "Uh it's a BMW truck." BAINES asked SMITH, "Do you see him?" SMITH stated, "Yeah, yeah, I see it, you said a truck right." BAINES stated, "Yeah." SMITH replied, "Yeah I'm pulling right here, yeah I see him." BAINES stated, "All right."

91.   At this time, agents observed SMITH pull up in a blue Chevrolet bearing Illinois license plate 203-2704. Agents then observed SMITH park directly behind Individual D's truck. A short time thereafter, agents observed SMITH exit the Chevrolet and approach Individual D. After a brief encounter,

46

agents observed Individual D enter into his truck and depart the area. SMITH was observed entering the Chevrolet and he subsequently departed the area.

92. Agents maintained constant surveillance on Individual D as he departed the area. At approximately 2408 West Congress Parkway, CPD conducted a traffic stop on Individual D for a traffic violation. As CPD officers approached Individual D, they observed him holding a rolled cigarette containing suspect cannabis. CPD proceeded to place Individual D into custody. At this time, Individual D spontaneously stated he had a gun under the front driver seat. CPD officers subsequently searched Individual D vehicle incident to arrest and located a blue steel High Point Firearm, .380 caliber, with a 3 inch barrel.

### i.    Post Arrest Statement of Individual D.

93. At approximately 1:20 p.m., agents advised Individual D of his *Miranda* rights per pre-printed card. Individual D related that he understood his rights and agreed to waive them. Agents began the interview by stating to Individual D that no promises could or would be made to him regarding charging and or sentencing decisions.

94. Individual D related that he had the gun for protection. Individual D stated that last night when he walked to his car, he found a hallmark card with a threatening message in it.

95.    Individual D related that he ignored the card and that this morning he found another card with the same message. Individual D stated that he feared for his family and for his own safety.

96.    Individual D related that he took the note seriously, because in March of 2006, while living in Berwyn, Illinois with his family, he was home invaded. Individual D stated that there were about four subjects with masks on. Individual D stated that they took some televisions, approximately six-thousand dollars in cash, one shotgun and two handguns.

97.    Individual D related that he did not see the subjects' faces but that he believed that the people who home invaded him were part of the Two-Sixers street gang. Individual D related that he filed a police report with the Berwyn Police Department regarding the home-invasion.

98.    Individual D related that on today's date, he began calling several of his friends to ask them for a gun. Individual D related that the only friend that answered his call was his friend "C" [BAINES]. Individual D stated that he told his friend "C"[BAINES] that he needed a gun and that it was urgent. It should be noted that Individual D did not volunteer any additional information regarding his friend "C"[BAINES].

99.    Individual D stated that his friend "C" [BAINES] told him that he'll try to get a gun for him and that he "C" will call Individual D back. Individual

48

D related that a short time later, his friend "C's" [BAINES] called him back and told him to go to the west side of Chicago and that his [BAINES's] cousin [SMITH] was going to give him a gun.

100.   Individual D stated that he was told by his friend "C" [BAINES] to go to the vicinity of Laramie and Lotus to pick up the gun. Upon Individual D's arrival, he met a unidentified black male [SMITH] that was driving a blue car who asked Individual D if he was "C's" [BAINES's] buddy. Individual D stated yes and he related the unidentified black male [SMITH] gave him the gun. Individual D stated that a short time later he was stopped by the police.

### ii.   Individual D's Cooperation.

101.   Individual D advised CPD Officers that he wanted to cooperate with the police and that he could obtain more firearms. Based on the on-going investigation, Individual D was subsequently released.

102.   On the same date, November 17, 2007, at approximately 6:00 p.m., CPD officers received a call from Individual D. Individual D related that he had two more guns and that he was going to place them in a dumpster behind the Shell gas station located on Ridgeland and Ogden Avenue.

103.   At approximately 6:50 p.m., CPD officers called Individual D and advised him that they were on the way. Individual D related that he would wait until officers were closer before placing the handguns in the dumpster.

49

104.   At approximately 6:58 p.m., an agent of the Illinois State Police narcotics team advised CPD officers that he had observed Individual D placing a bag behind a blue dumpster, by the Shell gas Station located at 6400 W. Ogden Avenue, Berwyn, Illinois.

105.   At approximately 7:03 p.m., CPD officers spoke with Individual D, who related he had placed the guns inside a plastic bag, and placed the plastic bag behind the blue dumpster.

106.   At approximately 7:04 p.m., CPD officers recovered a cardboard box containing a white plastic bag containing a cloth and two firearms. The firearms recovered were: (a) one Colt .38 special blue steel revolver, serial number 328329; and (b) a .38 caliber revolver with a 4 ½ inch barrel, loaded with five .38 caliber rounds.

107.   At approximately 7:05 p.m., Individual D called CPD officers, when they over heard BAINES's voice in the background talking to Individual D on a separate phone. CPD officers heard BAINES state, "Your on your own now, that's it that's the last one."[18] Individual D then asked if CPD officers had recovered the firearms. CPD officers advised Individual D the firearms had been recovered.

---

[18]      The identity of BAINES was established by, among other things, the following: law enforcement identified BAINES voice as the subject Individual D was talking with as the same voice as the principal user of **Target Phone 1**, which has previously been established as BAINES.

### iii.   Criminal Histories of BAINES and SMITH

108.   Based on a review of records from NCIC and other law enforcement databases, it appears that on May 4, 1993, BAINES was convicted of criminal drug conspiracy, a felony.  Additionally, on January 20, 1993, BAINES was convicted of manufacture/delivery of a controlled substance, a felony.

109.   Based on a review of records from NCIC and other law enforcement databases, it appears that on December 28, 1999, SMITH was convicted of possession/use of a firearm, a felony, and that on March 31, 1992, SMITH was convicted of robbery, also a felony.

### C.   Narcotics Seizure from BAINES and BURGOS.

110.   On November 30, 2007, at approximately 11:01 a.m., BAINES made an outgoing call over **Target Phone 2** (call 1378) to Individual EE.  During the call, Individual EE stated, "She told me last night [Unknown female told Individual EE that he needed narcotics] when I got in but it was late. You up?" BAINES responded, "I been up man. I was giving you time, thought you might be talking about you might of been sleep." Individual EE  stated, "Man, I been out since 8:30 a.m."  Individual EE then stated, "Slide out west right fast." BAINES replied, "I gotta have Chuck pick me up, man."

111.   At approximately 1:38 p.m. on November 30, 2007, BAINES placed an outgoing call, (call 1382), to Individual EE over **Target Phone 2**.  During the

call, BAINES asked Individual EE, "Where you want to bump, shit, I ain't really got nowhere to go but uh." Individual EE replied, "Why don't you just wait about ten or fifteen, just chill there for a few minutes and then like when I get to Sconnie's you just start leaving or something and then you just meet me over on crystal [Individual EE's parent's residence located at 5455 West Crystal Street, Chicago, Illinois]. BAINES stated, "I have Chucky drop me off at my momma house [1400 South 21st Avenue, Maywood, Illinois] in my truck [2007 Chevrolet Tahoe bearing Illinois plate 901-9050] and then I come out west by [Individual DD] and fuck with him for a minute." Individual EE replied, "All right, I'll meet you over there [5455 West Crystal]."

112.    At approximately 2:29 p.m. on November 30, 2007, BAINES received an incoming call, (call 1388), from Individual EE over **Target Phone 2**. During the call, Individual EE stated, "What up?" "I'm fittin to leave Sconnie house now." BAINES asked, "Yo mamma's?" Individual EE replied, "Yeah, you can meet me there [5455 West Crystal]."

113.    At approximately 2:57 p.m. on November 30, 2007, agents observed BAINES driving his Tahoe, bearing Illinois license plate 901-9050, in the area of Augusta and Long streets. Agents continued their rolling surveillance of BAINES. Agents followed BAINES to 5455 West Crystal Street, Chicago,

Illinois. At this time, agents observed BAINES park on the south side of the street near the residence.

114.   At approximately 3:08 p.m. on November 30, 2007, agents observed two Hispanic females, pull up in a green Lexus LS400, bearing Illinois Law Enforcement plate 3839LE. Based on the arrest described below, agents later identified the females as BURGOS and her sixteen year old daughter. Agents observed BURGOS proceed to park directly in front of BAINES's Tahoe. Agents observed both BAINES and BURGOS remain in their vehicles.

115.   At approximately 3:10 p.m., BAINES placed an outgoing call, (call 1393), to Individual EE over **Target Phone 2**. During the call, BAINES asked Individual EE, "Where you at doggy?" Individual EE replied, "You know this traffic is fucked up, shit." Individual EE then asked, "You on your way there, you there already [at 5455 West Crystal]?" BAINES replied, "Yeah, I been here, I been here for like twenty minutes, fifteen, my girl [BURGOS] here too so." Individual EE later stated, "I'm coming off now on Kostner, I'm on my way."

116.   At approximately 3:46 p.m., agents observed BAINES depart the area. Immediately thereafter, agents observed Individual EE pull up in a blue Dodge truck bearing Illinois plate 34224L, and proceed to park directly behind BURGOS.

117.  At approximately 3:50 p.m., agents observed Individual EE exit the truck.  At approximately 3:53 p.m., agents observed Individual EE walk up to the passenger side of BURGOS's vehicle.  Agents observed Individual EE engage in a conversation with BURGOS while standing at the passenger side window. Shortly thereafter, agents observed BURGOS depart the area.

118.  Agents maintained constant surveillance on the Lexus as it departed the area.  At approximately 546 North Ridgeland Avenue, the CPD conducted a traffic stop on the Lexus for a traffic violation.  During the stop, the CPD contacted the driver, BURGOS.  At this time, CPD officers observed BURGOS make a sudden movement to her front jacket pocket.  CPD officers asked BURGOS to exit the vehicle for officer safety.  CPD officers proceeded to ask BURGOS if she was attempting to conceal something at which time BURGOS stated, "I got some drugs on me."  BURGOS then reached into her jacket pocket and produced a clear plastic bag containing a dark in color, thick substance, that appeared to be brown tar heroin.  CPD officers seized the substance.  The suspect heroin was subsequently sent to the Illinois State Police Lab.  The lab indicated the substance was 41.3 grams of heroin.  BURGOS was arrested.

119.  On November 30, 2007, at approximately 4:45 p.m., CPD officers conducted a post arrest interview of BURGOS.  CPD officers proceeded to read BURGOS her *Miranda* warnings.  BURGOS stated she understood her rights

54

and was willing to cooperate with law enforcement. CPD officers asked BURGOS about the events leading up to her arrest. BURGOS related she had approximately 50 grams of heroin in her possession. BURGOS related she obtained the heroin from an unidentified, heavy set, black male with braids. BURGOS related she met the unidentified male by a gas station located in the area of Central and Division Streets, Chicago, Illinois. BURGOS related the black male drives a black pickup truck. BURGOS further related the heroin was already prepaid for and that no money was exchanged at the meet location. BURGOS related she paid $50 a gram. BURGOS related she usually is "fronted" the narcotics and pays the supplier at a later time. BURGOS related she has purchased narcotics on three different occasions from the heavy set black male with braids, but BURGOS refused to identify the individual by name. Upon search of her person, CPD officers located approximately $1,831 on BURGOS. She stated that she obtained the money from bartending.

## VII.   PROBABLE CAUSE IN SUPPORT OF SEARCH WARRANTS

### A.   Places to be Searched and Things to be Seized

120. Based upon my training, experience, and participation in drug offense investigations as well as the financial implications which result from violations of narcotic laws, I know that those involved in drug trafficking

maintain the following items at their residences and/or locations where they conduct drug business:

a.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, and dilutants;

b.   Pagers, cellular phones, caller identification, and other communication devices;

c.   Books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the distribution of controlled substances;

d.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

e.   Cash, currency, financial instruments, and records relating to controlled substances income and expenditures of proceeds of drug- transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging, in drug trafficking activities;

f.   Photographs of individuals, associates, their property and their drugs; and

g.   Records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.

121.   In addition, during the course of past residential searches of drug traffickers, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of

the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys.

122. The following is submitted in support of warrants to search the residences at: (a) 474 North Lake Shore Drive, Apartment 4104, Chicago, Illinois; (b) 901 North Lawler, Floor 2, Chicago, Illinois; and (c) 1400 South 21st Avenue, Maywood, Illinois.

**B.    Probable Cause in Support of Search Warrants**

**(1)    474 N. Lake Shore Drive, Apt. 4104, Chicago, Illinois.**

123. During this investigation agents learned that 474 North Lake Shore Drive, Apartment 4104, Chicago, Illinois is one of BAINES' residences. Throughout the investigation agents have observed BAINES arriving and leaving from this location. Agents have also observed BAINES' vehicle parked in his assigned parking spot on numerous occasions. Furthermore, agents have observed BAINES meet with members of the BAINES DTO on the street in front of his residence and have observed other members of the BAINES DTO park and enter the residence. Additionally, during intercepted wire communications BAINES' stated he lives at this residence and stays in apartment 4104.

124. On November 1, 2007 at approximately 7:57 p.m., based on intercepted wire communications over **Target Phone 1**, agents established

surveillance at 474 North Lake Shore Drive, Chicago, Illinois. At approximately

8:11 p.m., BAINES placed an outgoing call, (call 2539), over **Target Phone 1**, to

an unidentified female. During the call, BAINES stated that he was "coming

down." At approximately 8:07 p.m., agents observed BAINES exit the building

located at 474 North Lake Shore Drive, Chicago, Illinois.

125.   On December 10, 2007, based on intercepted wire communications

over **Target Phone 1**, agents established surveillance at 474 North Lake Shore

Drive, Chicago, Illinois. At approximately 5:59 p.m., BAINES received an

incoming call, (call 4983), from Individual G, over **Target Phone 1**. During the

call, Individual G asked, "Where you at man?" BAINES stated, "Shit, I could be

that way, about, I'm downtown." Individual G asked, "You want me to pull down

there somewhere?" BAINES replied, "Yeah you could if you want to, it's up to

you." Individual G stated, "Alright. Where you at?" BAINES said, "Right down

from the Lucky Strike." Individual G asked, "By da shore?" BAINES stated,

"Yep, I'm on the end, I'm on Illinois and Lakeshore Drive." Individual G stated,

"Alright, I'll call you when I am close by." BAINES replied, "Illinois and

Lakeshore, ahh 474 [meaning 474 North Lakeshore Drive]." Individual G stated,

"Alright, I'll call you soon as I get right there." BAINES said, "Alright, pull in the

front and put the flashers on or something."[19]  At approximately 7:30 p.m.,

---

[19]    Individual G's identity was established by, among other things, the
following: agents identified Individual G as he arrived at BAINES residence, and
during a stop and subsequent arrest involving Individual G on January 22, 2008, CPD
officers identified Individual G's voice as the subject who had been talking to BAINES.

agents observed a blue minivan bearing Illinois license plate 657-5408, parked on Illinois Street directly in front of 474 North Lake Shore Drive, Chicago, Illinois. Agents observed the minivan's hazard lights were flashing. At approximately 8:07 p.m., agents observed Individual G exit the front entryway of 474 North Lake Shore and enter the minivan.[20]

126. On December 17, 2007, BAINES placed an outgoing call, (call 5373), to an unknown male, over **Target Phone 1**. During the call, BAINES stated, "Damn, bump into me. You can't tie me up like that, man. Shit already fucked up man [meaning BAINES wants unknown male to pay him for past fronted narcotics]." The unknown male replied, "I'll get you. I'll get you, brother-in-law." BAINES stated, "I get that back, man. I ain't trippin', man [meaning BAINES will take the narcotics back if the unknown male can't pay him for it]." The unknown male replied, "I'll get you that. Okay. I'll, I'll bump into you." On December 19, 2007, BAINES received an incoming call (call 5518) over **Target Phone 1**, from the same unknown male. During the call, the unknown male stated, "I'll come now, I'm on my way to you." BAINES stated, "Downtown." The unknown male stated, "Where you want to meet at?" BAINES stated, "My crib down here [meaning 474 North Lake Shore Drive]." At approximately 3:50 p.m., agents established surveillance at 474 North Lake Shore Drive.

---

[20]     Agents captured Individual G on videotape as he exited the front entryway of 474 North Lake Shore Drive, and entered into his vehicle.

127.   At approximately 4:01 p.m., BAINES received an incoming call, (call 5526) over **Target Phone 1**, from the unknown male.  During the call, the unknown male stated, "I'm right out in front." BAINES replied, "I'll be two minutes." BAINES then stated, "I'll be two minutes, walking down now." At approximately 4:13 p.m., agents observed BAINES walking from 474 North Lake Shore Drive and proceed to enter into a Chevrolet Carryall bearing Illinois license plate 584-7350. A short time thereafter, agents observed BAINES exit the vehicle and walk back towards 474 North Lake Shore Drive.

128.   On January 7, 2008, based on intercepted calls over **Target Phone 2**, law enforcement established surveillance at 474 North Lake Shore Drive, Chicago, Illinois. At approximately 8:59 p.m., agents observed BAINES exit the parking garage located at 474 North Lake Shore Drive.  Agents observed BAINES was driving his Chevy Tahoe. A short time thereafter, law enforcement initiated a traffic stop on BAINES.  BAINES was subsequently detained for driving on a suspended driver's license. After obtaining verbal consent to search his person and vehicle, law enforcement proceeded to search his vehicle. During the search, law enforcement located a small plastic baggie containing marijuana. Law enforcement then search BAINES' person and located approximately $1,500.

129.   On January 8, 2008, based on intercepted telephone calls over **Target Phone 2**, at approximately 3:30 p.m., law enforcement established

surveillance near the entrance of 474 N. Lake Shore Drive.  At approximately

4:02 p.m., agents observed Individual EE, in a white Cadillac Escalade bearing

Illinois license plate X26-8362, pull up to the front entrance of the building.[21]  A

short time thereafter, a law enforcement observed BAINES exit the door of 474

N Lake Shore Drive and enter the passenger side of the Cadillac Escalade.

130.   On May 23, 2008, at approximately 11:00 a.m., agents observed

BAINES' Chevy corvette parking in his assigned parking spot for apartment

4104, at 474 North Lake Shore Drive.  On June 5, 2008, at approximately 10:30

a.m., agents observed BAINES departing the parking garage at 474 North Lake

Shore Drive, Chicago, Illinois.  Agents observed BAINES was driving a Chevy

corvette, bearing Illinois license plate 913-4919.[22]

(2)   **901 North Lawler, Floor 2, Chicago, Illinois**

131.   During this investigation, agents learned that this is the residence

of PARKER's mother, who is also BAINES' aunt.  Throughout this investigation,

both PARKER and BAINES have been observed by agents utilizing this

residence.  On two different occasions, CS1 has made controlled purchases of

heroin from PARKER who retrieved the heroin from this residence.

---

[21]     Illinois license plate X26-8362 is registered to Vernon Plummer and
Individual EE at 1120 32nd Avenue, Bellwood, Illinois.

[22]     Illinois license plate 913-4919 is registered to BAINES' father at 1400
South 21st Avenue, Maywood, Illinois.

132.   On July 3, 2007, as detailed above, CS1 made a controlled purchase of heroin from BAINES and PARKER.   During the transaction, CS1 was followed to 901 North Lawler, Chicago, Illinois. Agents observed CS1 arrive in front of 901 North Lawler.  Shortly thereafter, agents observed PARKER exit 901 North Lawler and walk to the street.  Agents then observed PARKER enter the front passenger side of the CS Vehicle. A short time later, agents observed PARKER exit the CS' vehicle and walk back into 901 North Lawler. Agents then observed CS1 depart the area. CS1 later relinquished approximately 50.1 grams of heroin to agents.  CS1 related  PARKER provided him/her with the heroin after he got into the CS' vehicle.

133.   On July 20, 2007, as detailed above, CS1 mad a controlled purchase of heroin from PARKER.  During the transaction, agents observed PARKER along with three unknown individuals on the front porch of 901 North Lawler, and also observed CS1 go with PARKER inside of 901 North Lawler.  A short time later, agents observed CS1 and PARKER walking out of 901 North Lawler. Agents observed CS1 getting into the CS1's vehicle.  Agents observed PARKER getting into a Blue Dodge Magnum bearing Illinois license plate number 670-0189. A short time later, agents observed CS1 depart PARKER's residence. Agents then observed PARKER following CS1.  Agents observed PARKER continue to follow CS1 for a short period of time before PARKER departed the area.

134. CS1 later relinquished approximately 99.9 grams of heroin to agents. CS1 related that he/she arrived at PARKER's house located 901 N. Lawler Street, Chicago, Illinois. CS1 related that when he/she arrived at PARKER's house, CS1 parked in front of the house, and saw PARKER along with three other unknown individuals on the front porch of the house. CS1 related that PARKER greeted CS1, and told CS1 to go inside the house. CS1 related that he/she followed PARKER to the living room of the second floor apartment of 901 N. Lawler Street, Chicago, Illinois. At this time, PARKER asked to see the money. CS1 related that he/she gave the money to PARKER. PARKER then asked CS1 how the money was stacked. CS1 told PARKER that each stack was $2,000. PARKER then looked at the money and placed it in his pocket. CS1 related that PARKER went to the rear of the apartment, came back a short time later and gave CS1 a plastic bag containing the heroin. CS1 then departed the residence, with the heroin.

135. On October 6, 2007, at approximately 3:16 p.m., BAINES used **Target Phone 1** (call 1345) to contact an unknown male at 773-269-9265. The unknown male told BAINES that he was using "Blue's" phone because he took his to get it fixed. BAINES told the unknown male, "I'm goin' to the building

right now.... I'm on my way to, over to, uh, uh, June mamma house."[23] The unknown male stated, "Okay. I'm gonna come to over there."

136.   On November 18, 2007, at approximately 4:56 p.m., BAINES used **Target Phone 2**, (call 433) to call Individual W, on telephone number 773-260-2673. Individual W asked where BAINES was at and BAINES told him, "At June mamma house." An argument ensued and BAINES told Individual W, "We are over June mamma house. I got that package for you. Now if you choose that you want it, come and get it [meaning BAINES had narcotics at 901 North Lawler and he was waiting for Individual W to come and get them]." Individual W responded, "Okay, alright. Thank you."

137.   On November 18, 2007, at approximately 6:12 p.m., BAINES used **Target Phone 2**, (call 434) to call Individual X, at telephone number 773-419-9159. Individual X told BAINES that he was at his grandparent's house and was eating and then asked BAINES where he was at. BAINES replied, "Around the corner." Individual X asked, "Where? At June mamma house?" BAINES stated, "Yes." Individual X told BAINES, "I can be there in about ten minutes." BAINES responded, "Okay, Cool."

138.   On January 11, 2008, at approximately 2:04 p.m., PARKER used telephone number (773) 287-9138 to call BAINES on **Target Phone 2** (call

---

[23]   During numerous intercepted wire communications, BAINES calls CHARLES PARKER "June." As detailed above, agents have learned through surveillance and other intercepted wire communications that "June's mamma house" or "June's mother's house" is 901 North Lawler, Apt. #2, Chicago, Illinois.

4936).[24] PARKER asked BAINES, "It's been fourteen [14] minutes. Where you at?" BAINES responded, "Shut the fuck up, man. Leave me the fuck alone. I'm right here at Lake Street. What's going on? Hey! Stop calling from the house phone too, man. You running my minutes up." PARKER asked, "You broke or something?" BAINES later stated, "I'm going to turn all this shit off [meaning BAINES was mad at PARKER for using the land line phone at this residence which BAINES pays for]."

139.  On June 2, 2008, at approximately 5:00 p.m., agents established surveillance at 901 North Lawler, Chicago, Illinois. At approximately 5:15 p.m., agents observed BAINES Chevy Corvette, bearing Illinois license plate 913-4919, parked in front of 901 North Lawler. Agents observed BAINES sitting in the driver seat of the vehicle. A short time thereafter, agents observed PARKER exit the front door of the residence and proceed to get in the passenger side of BAINES' vehicle.  Agents observed BAINES and PARKER engage in a conversation. Shortly thereafter, agents observed BAINES and PARKER exit the vehicle and proceed inside 901 North Lawler.

140.  On June 5, 2008, agents contacted a postal inspector with the U.S. Postal Service.  The postal inspector advised agents as of May 2008, Deloise BAINES, Bobby BAINES, and CHARLES PARKER were all receiving mail at 901 North Lawler #2, Chicago, Illinois.

---

[24]    Phone number (773) 287-9138 is subscribed to Deloise A. Baines at 901 North Lawler Avenue, Floor 2, Chicago, Illinois.

(3)    **1400 South 21st Avenue (and detached garage), Maywood, Illinois**

141.  During this investigation, agents have learned that 1400 South 21st Avenue, Maywood, Illinois is the residence of BAINES' father and mother. Throughout this investigation, agents have learned BAINES stores vehicles at this location and frequently uses this location as a meeting spot.

142.  On October 31, 2007, at approximately 11:24 a.m., Eddie Baines used telephone number 708-410-0641 to contact BAINES on **Target Phone 1**, (call 2388).  Eddie Baines told BAINES, "Hey, man.  You gotta do something 'cause I can't... I try to get out of my garage the other day and I had to twist around that god damn thing. You come on and move your Corvette in back of my Corvette or something because I can't get out the garage.  You got all them motorcycles and them mother fuckers. You ought to take them and put them in a storage over there."  Eddie Baines then asked, "You understand what I'm saying?" BAINES says, "Um-uh."

143.  On November 14, 2007, at approximately 11:19 a.m., Eddie Baines used telephone number 708-410-0641 to contact BAINES over **Target Phone 1**, (call 3510).  Eddie Baines and BAINES discussed an individual who was unable to pay the note on his truck.  BAINES told Eddie Baines, "I was, I was gonna take your truck and trade it in and refinance it, and, and get, it's, it's a black, it's just, just like my truck.  It's a black 2007." Eddie Baines replied, "Yeah. I'll, I'll take, I'll take that and pay for it...  If you can't get it refinanced, uh, then give

me the keys to it.... You just trying to establish some credit.  You don't need nobody go and fuck it up right away." BAINES agreed.

144.  On December 9, 2007, at approximately 4:03 p.m., Eddie Baines used telephone number 708-410-0641 to contact BAINES over **Target Phone 1**, (call 4931).  Eddie Baines told BAINES, "This car note due pretty soon." BAINES replied, "I was gonna come out and bring the car note money to you."

145.  On December 10, 2007, at approximately 12:58 p.m., Eddie Baines used telephone number 708-410-0641 to contact BAINES on **Target Phone 1**, (call 4950).  Eddie Baines asked, "Did you talk to that girl?" BAINES stated, "Yeah she is studying for a test I'm going to hook up later on."  Eddie Baines stated, "Okay cause you got to do something I ain't going to sit around here and babysit none of that [narcotics].  (UI) she had brought up in the house and, and leave it here with me god dammit.  (UI).  BAINES asked, "You alright?" Eddie Baines stated, "Yeah I'm just pissed off at this situation, here man,  I ain't going through this.  You share this responsibility.  Not none of mine.  Ain't gonna let it be mine 'cause I didn't do nothin' for my own momma...so they (UI) on my end. BAINES stated, "..(UI) later on." Eddie Baines stated, "They got the wrong guy." BAINES replied, "You crazy." Eddie Baines stated, "Yeah, the wrong guy." BAINES stated, "We be by later on."  Eddie Baines stated, "Yeah alright."

146.  On January 21, 2007, at approximately 10:06 a.m., Eddie Baines used telephone number 708-410-0641 to contact BAINES on **Target Phone 1**,

(call 6892). Eddie Baines asked BAINES, "You say you got to bring Carla with you?" Eddie Baines said, "Well, I don't need her... You stay over there with her 'cause it's between me and some business that we got to take care of. I don't want nobody to know what we doing." He continued, "Well, okay, well then stay with, there with her and babysit. I ain't gonna be bothered." BAINES stated, "Alright."

147. On June 4, 2008, at approximately 10:00 a.m., agents established surveillance in the vicinity of 1400 South 21st Avenue, Maywood, Illinois. At approximately 1:40 p.m., agents observed BAINES arrive in his Tahoe, bearing Illinois license plate 901-9050, and proceed to park in front of his father's residence. At this time, agents observed BAINES along with three unidentified passengers exit the vehicle. Agents observed the three unidentified subjects enter the residence of 1400 South 21st Avenue, Maywood, Illinois. Agents further observed BAINES start to converse with additional unidentified subjects who just drove up to the location in a white Buick Sedan, bearing Illinois license plate X37-0609. At this time, agents observed BAINES was holding a black plastic bag, which was partially full and double knotted. A short time later, agents observed BAINES enter the residence.

148. At approximately 2:05 p.m., agents observed two of the unidentified passengers exit the residence, get into BAINES Tahoe and depart the area. At approximately 2:25 p.m., agents observed BAINES and the third unidentified

passenger exit the residence, get into BAINES silver corvette and depart the area.

149. On June 5, 2008, agents contacted a postal inspector with the U.S. Postal Service. The postal inspector advised as of June of 2008, Carmelo LUGO, and as of April of 2008, Eddie Baines, CHRISTOPHER BAINES, and Sherley BAINES were all receiving mail at this location.

## V.   PROBABLE CAUSE FOR SEIZURE WARRANT OF BAINES' TAHOE

150. As discussed above, BAINES has used his Chevrolet Tahoe to facilitate a number of drug transactions in which he has been involved. Specifically, BAINES was surveilled using his Tahoe in connection with the July 3, 2007 controlled purchase of heroin; the November 16 seizure of heroin; and November 30, 2007 seizure of heroin.

151. Based on the foregoing, there is probable cause to believe that this vehicle will be subject to forfeiture upon conviction of defendants for violations of Title 21 United States Code,  846 (conspiracy to distribute controlled substances).

152. In order to ensure the availability of the vehicles is preserved for forfeiture, Title 21, United States Code, Section 853(e) authorizes the entry of a restraining order or any other action necessary to preserve the property. Title 21, United States Code, Section 853(f) states, in the same manner as provided for a search warrant, a seizure warrant may be issued when the property would,

in the event of conviction, be subject to forfeiture and a restraining order may not be sufficient to assure the availability of the property for forfeiture. The government seeks a seizure warrant under Section 853(f) because a restraining order or any other action is not sufficient to assure the availability of the subject vehicles for forfeiture. Courts have long recognized that the unique circumstances involved in searching vehicles due to their inherent mobility. Moreover, in *Florida v. White*, 526 U.S. 559 (1999), the Supreme Court found that a warrantless seizure did not violate the Fourth Amendment where there was probable cause to believe that the automobile was subject to forfeiture because movable contraband may be "spirited away."

153. In my experience, I know that motor vehicles are easily transferred or hidden thereby making them difficult to locate. Moreover, I am aware that the appearance of a motor vehicle can be altered or it can be concealed in a garage or storage area making it difficult, if not impossible, to find for the purpose of forfeiture proceedings. In addition, motor vehicles can be transported outside the district further increasing the potential unavailability of these motor vehicles for forfeiture in the event of conviction. Furthermore, I know that unless a motor vehicle is seized, it can be difficult to preserve the value of the motor vehicle for forfeiture purposes because financial obligations relating to the vehicle, including insurance payments and loan obligations are not satisfied,

70

when an owner is notified that it is likely his property will be subject to forfeiture.

## CONCLUSION

154. WHEREFORE, Affiant submits that the foregoing evidence establishes that the named defendants conspired and agreed with each other and with others to knowingly possess with intent to distribute and distribute controlled substances, namely, in excess of 1 kilogram of heroin, in violation of Title 21, United States Code, Section 846, and did aid and abet said conspiracy, in violation of Title 18, United States Code, Section 2. Finally, Affiant submits that there exists probable cause that defendants are using each of the locations identified in furtherance of their drug trafficking activities and that evidence of those activities will be found therein, and respectfully requests that the Court issue search warrants for those locations.

FURTHER AFFIANT SAYETH NOT.

_____
Eric Durante, Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN before me this _16th_ day of July 2008.

_____
Honorable Morton Denlow
United States Magistrate Judge
Northern District of Illinois